IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re:<br><br>**LIBERTY COAL COMPANY, LLC,**<br><br>Debtor.<br><br>**DANA S. FRAZIER, trustee of the estate of** Liberty Coal Company, LLC,<br><br>Appellant,<br><br>v.<br><br>**SIKESTON BOARD OF MUNICIPAL UTILITIES; KANSAS CITY BOARD OF PUBLIC UTILITIES; CITIES TRUST; WESTERN FUELS SERVICES CORPO- RATION; and WESTERN FUELS– ILLINOIS, INC.,**<br><br>Appellees. | Case No. 09-CV-0371-MJR |

## OPINION

**REAGAN, District Judge:**

  This case involves Bankruptcy Trustee-Appellant Dana Frazier's ("Frazier") effort to hold the five Appellees liable for the debts left unpaid by Debtor Liberty Coal Co., LLC from operating a coal mine in southern Illinois. She brings the case on behalf of the unsecured creditors of the Debtor to pursue the Appellees, two municipal utility companies and their affiliates, for approximately $4 million. Frazier claims that Appellees should be responsible for debts on theories of corporate veil piercing.

  Frazier, as trustee of the Chapter 7 bankruptcy estate of Liberty Coal Co., LLC, instituted this adversary proceeding (No. 08-4045) on May 12, 2007 against several stakeholders in Liberty to

recover property for the estate. Those stakeholders moved for summary judgment which the bankruptcy court granted on April 7, 2009, denying Frazier all relief.

On April 15, 2009, Frazier perfected an appeal to this Court, which has jurisdiction over appeals "from final judgments, orders, and decrees" in matters referred to bankruptcy judges. 28 U.S.C. § 158(a) (2006). However, there is no judgment set out on a document separate from any memorandum or opinion, which is the usual way for final judgment to be entered. *See* Fed. R. Bankr. P. 7058 (noting that Civil Rule 58 applies in adversary proceedings and that any reference to the "civil docket" means the docket in Bankruptcy Rule 5003); Fed. R. Civ. P. 58(a) (noting that every judgment "must be set out in a separate document" except for orders disposing of certain post-trial motions); Fed. R. Civ. P. 58(c)(2) (noting that judgments that must be on a separate document are not deemed entered until either set out in a separate document or until 150 days elapse after a judgment notation is made on the civil docket); *In re Behrens*, 900 F.2d 97, 99 (7th Cir. 1990) ("[The bankruptcy rules], like Rule 58, require[] that a court set forth its judgment in a document separate from its opinion. The judgment must be self-contained and complete, setting forth the disposition and the relief to which the prevailing party is entitled; and, since the judgment is not an opinion, it should not contain any legal reasoning." (citations omitted)). In the instant case, the only document on the adversary docket purporting to be a judgment is Judge Meyers' order granting summary judgment. His order contains the disposition and the relief granted the prevailing party. No other document on the adversary docket "sets forth the disposition and the relief to which the prevailing party is entitled." Typically, the bankruptcy court in this district enters a separate judgment, and the failure to do so in this case was mere inadvertence. However, the failure of the bankruptcy court to observe a formality does not prevent the Court's appellate jurisdiction. *In re Behrens*, 900 F.2d at 99. The requirement for a separate document is not jurisdictional. *See Bankers Trust Co. v. Mallis*, 435 U.S. 381, 383 (1978) ("We conclude that the Court of Appeals for the Second Circuit was correct in

deciding that it had jurisdiction in this case despite the absence of a separate judgment."). So long as the order from which the parties appealed is a final order, 28 U.S.C. § 158(a), and the parties fail to mention the failure of the court to enter judgment, they will have waived the issue and the district court can take up the case. *In re Behrens*, 900 F.2d at 100 (citing *Bankers Trust*, 435 U.S. 381; *Wikoff v. Vanderveld*, 897 F.2d 232 (7th Cir. 1990)). The standard for the finality of orders in bankruptcy cases is more flexible than in civil cases. *Tidwell v. Smith* (*In re Smith*), 582 F.3d 767, 776 (7th Cir. 2009) (quoting *Zedan v. Habash*, 529 F.3d 398, 402 (7th Cir. 2008)). A bankruptcy court's order is final "when it definitively resolves a discrete dispute within the larger case." *Id.* (citing *In re Comdisco, Inc.*, 538 F.3d 647, 651 (7th Cir. 2008)). Judge Meyers' order meets this standard. He granted summary judgment to all defendants on all claims and ordered that "judgment is entered," indicating that he intended that there was nothing left to decide in the adversary proceeding. More than a discrete dispute was resolved.

But since 150 days has elapsed since the clerk made the notation on the docket that judgment had been entered, a final and appealable judgment in fact exists. Fed. R. Civ. P. 58(a). Confident in its ability to consider this appeal, the Court now turns to the merits.

### Standard of Review

On appeal, the Court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013. Additionally, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Id.*

Case law of this Circuit similarly instructs that a bankruptcy judge's "[f]actual findings are reviewed for clear error; [and] legal conclusions are reviewed de novo." *In re Doctors Hosp. of Hyde Park, Inc.*, 474 F.3d 421, 426 (7th Cir. 2007); *accord In re Crosswhite*, 148 F.3d 879, 881 (7th Cir. 1998);

*Meyer v. Rigdon,* 36 F.3d 1375, 1378 (7th Cir. 1994). In fact, the standard of review that a district court applies on appeal from a bankruptcy judgment is the same standard applied by a Court of Appeals. *Monarch Air Service, Inc. v. Solow* (*In re Midway Airlines, Inc.*), 383 F.3d 663, 668 (7th Cir. 2004). However, granting a motion for summary judgment is a legal conclusion, meaning that it is reviewed de novo. *Id.* De novo review makes sense especially considering that neither the bankruptcy court nor the district court has had an opportunity "to judge the credibility of the witnesses" at the summary judgment stage. Fed. R. Bankr. P. 8013.

Summary judgment is appropriate where the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Estate of Suskovich v. Anthem Health Plans of Va., Inc.*, 553 F.3d 559, 563 (7th Cir. 2009) (citing Fed. R. Civ. P. 56(c)); *accord, Breneisen v. Motorola, Inc.*, 512 F.3d 972 (7th Cir. Cir. 2008); *Levy v. Minn. Life Ins. Co.*, 517 F.3d 519 (7th Cir. 2008). In ruling on a summary judgment motion, the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party (here, Frazier). *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 600 (7th Cir. 2009); *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 630 (7th Cir. 2007); *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

In response to summary judgment, the non-movant cannot rest on the pleadings. Rather, the non-movant must provide evidence on which the jury or court could find in favor of the non-movant. *Maclin v. SBC Ameritech*, 520 F.3d 781, 786 (7th Cir. 2008). As the Seventh Circuit recently explained:

> [T]he non-moving party must submit evidence that there is a genuine issue for trial. The existence of merely a scintilla of evidence in support of the non-moving party's position is insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party.

*Giant Screen Sports v. Canadian Imperial Bank of Commerce*, 553 F.3d 527, 531-32(7th Cir. 2009) (citation omitted) (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 694 (7th Cir. 2006)).

Stated another way, to counter a summary judgment motion, the nonmoving party may not simply reiterate the allegations contained in his pleadings; more substantial evidence must be presented. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986), or "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [non-moving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

One additional consideration is that not all issues of fact are material. As the Supreme Court put it:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case *necessarily renders all other facts immaterial.*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027, 1036 (7th Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).

### Facts

Viewing the discovery evidence in the light most favorable to the non-moving party (Appellant Frazier), the Court will assume the following for the purpose of deciding this appeal.[1]

---

[1] The citations in this section are from documents in the adversary proceeding (No. 08-4045) unless otherwise specified.

The Sikeston Board of Municipal Utilities (Sikeston Board) and the Kansas City Board of Public Utilities (Kansas Board) are municipalities that provide utilities for their respective cities (Sikeston, Missouri and Kansas City, Kansas), including coal-powered electricity. During the relevant time period, the manger of the Sikeston Board was Ed Throop. Notables associated with the Kansas Board during the relevant time period were Bernard Cevera, who in 2001–2002 was assistant general manager and then manager of the electric division, and Darrell Dorsey, assistant manager for electric production and supply during 2001–2002. The Sikeston Board and the Kansas Board (the Utilities) are both members of Western Fuels Association, Inc. (WFA), a Wyoming nonprofit corporation that functions as a fuel-supply cooperative for its members. Its members own coal-powered electric generators and are rural cooperative utilities and municipal utilities. The WFA created and owns all of the voting stock in two relevant corporations: Western Fuels–Illinois, Inc. (WFI) and Western Fuels Services Corp. (WFSC). The Utilities own half of the preferred stock in WFI but own no stock in WFSC.

In late 1979, the Utilities each made an agreement (Supply Agreements) with WFI for WFI to supply coal from the Brushy Creek Mine in Saline County, Illinois. (Doc. 30 ¶ 5.) As part of the Supply Agreements, the Utilities assumed responsibility for mine reclamation and other legacy costs resulting from the benefit package for union workers at the Brushy Creek Mine. WFI owned the mine property, including the coal reserves, and leased the mine to third party Kenellis Energies, Inc., an Illinois corporation. (*Id.*) Kenellis mined the coal and sold it back to WFI, which was a customary mining arrangement, and WFI used the coal to satisfy the Supply Agreements. (*Id.* ¶ 6.) Because of several disputes arising in the 1980s between Kenellis and WFI, WFI sought to buy all the stock of Kenellis, which it did on November 30, 1991. WFI renamed Kenellis the Brushy Creek Coal Co. (Brushy Creek). (*Id.* ¶ 9.) WFI maintained the same operating relationship with Brushy Creek after it obtained its stock as it did when it was a third party. (*Id.*)  Associated with the mine operations at

Brushy Creek was the Cities Trust, settled by the Utilities in 1987 to acquire an interest in Marion Coal Sales LP. Marion's purpose was to generate commission revenue from excess coal sales from the Brushy Creek Mine. The Utilities are the only beneficiaries of the Cities Trust, and the trustee at the time of the trust settlement was WFI.

Operations at the Brushy Creek Mine ceased in 1999. The legacy costs associated with the Brushy Creek Mine remained, and they were substantial. The Utilities sought a plan to take care of those legacy costs by developing a coal seam, the proceeds from which would be used to satisfy the legacy costs. Brushy Creek has been developing the number 6 coal seam at the Brushy Creek Mine, but about 100 feet below that seam was the number 5 coal seam. Employees of Brushy Creek began investigating the feasibility of developing number 5. In preparation of mining seam number 5, Brushy Creek employees also applied to the State of Illinois for grants to reopen the mine. Unlike Brushy Creek, though, number 5 would not be developed to supply coal to the Utilities. It would be developed to sell coal at a profit in order to satisfy the ongoing legacy costs arising from the former operation of Brushy Creek Mine. Additionally, the Utilities sought insulation from any liabilities accruing from any further mining venture. The Utilities lost money during the Brushy Creek venture and did not want to put new money at risk in a new mine.

Frazier's contention that the Appellees are alter egos for Liberty requires an analysis of the financial and contractual arrangements surrounding this venture so the court will delve into them to the extent necessary for a resolution of her contentions.

A legal entity needed to be created to reopen the Brushy Creek Mine. To that end, attorney David Swanson, whose firm was retained for the purpose, executed Articles of Organization on July 2, 2001 for a Colorado limited liability company named Liberty Coal Co., LLC, the debtor herein. Swanson advised for Colorado to be the state of Liberty's organization because "Colorado LLC law provides a simple and flexible set of standards for LLC operations." (Doc. 30 ¶ 16.) In the Articles

7

of Organization, Swanson named as initial managers Robert Norrgard, Ed Throop and Bernard Cevera. The Colorado Secretary of State received and file-stamped the articles on July 3, 2001. (Doc. 30 at 9.) Throughout Liberty's existence, the initial and successor managers held periodic, formal meetings. Minutes were kept, and actions were taken that were seconded and voted upon. Liberty also maintained its books and records, which were audited by an outside accounting firm annually.

Three days after the articles were received, July 6, 2001, several important transactions were consummated. First, the Utilities amended the trust agreement of the Cities Trust removing WFI as trustee and replacing it with WFSC. The amended trust agreement authorized WFSC to "incorporate, organize and acquire on behalf of the Trust 100% of the membership interests in Liberty" and the Utilities each agreed "to pay one-half of such costs and expenses (including counsel fees) as may be incurred by [WFSC] in connection with . . . the acquisition of the Membership Interest, or the performance by [WFSC] of any rights or duties associated with the ownership of the Membership Interest." (Doc. 74-2 at 1–2.) WFSC, for its part, agreed to "hold all estate, right, title, and interest in and to the Membership Interest [in Liberty] . . . for the equal and pro rata benefit of [the Utilities]; subject, however, to the terms and conditions hereof, of the Membership Interest and of the Operating Agreement of Liberty." (*Id.* at 2.) It was also to dissolve Marion Coal Sales and terminate the excess sales agreement. (*Id.*) The trust agreement also discussed matters relating to the Cities Trust's ongoing ownership of the interest in Liberty:

> Whenever [WFSC] shall receive on behalf of the Trust any notices, demands, or requests for consent related to the ownership of the Membership Interest, [WFSC] shall promptly mail copies of the same to [the Utilities]. [WFSC] shall maintain accurate books and records of all accounts, distributions, receipt of funds, and other matters relating to the Trust and the Membership Interest, and shall makes such books and records available to [the Utilities] during reasonable business hours. [WFSC] further agrees that it will not exercise any control with respect to the Units, or sell, dispose of, or otherwise deal with the Units, except in accordance with the powers granted to or

> the authority conferred on [WFSC] pursuant to this Agreement, or in accordance with mutual written instructions from [the Utilities].

(*Id.*) At least at this point, the parties agreed that trust would be organized under Colorado Law. (*Id.* at 3.)

The second transaction consummated on July 6 was that the Cities Trust (through WFSC) and Liberty (through its initial managers) executed an operating agreement. The Cities Trust would be sole member of Liberty and would be responsible for making "such Capital Contributions as the Board of Governors may determine unanimously from time to time with the consent of the Member" and by "Capital Contribution" the parties meant "the amount of money or the fair market value of any property contributed to the Company by the Member." The Cities Trust could also make loans to Liberty. The "Board of Governors" was the name that the operating agreement used for the managers of the company and would consist of three persons: one appointed by the Kansas Board (at the time Bernard Cevera), one by the Sikeston Board (at the time Ed Throop) and one that was the present general manager of WFA (at the time Rob Norrgard). The purpose of this arrangement of managers was so that the Utilities could control the Liberty board. The Cities Trust did not contribute money or property to Liberty at the time that this agreement was executed. After the formation of Liberty, the Kansas Board reported 50% of the assets and liabilities of Liberty on its annual financial statements.

Four important transactions occurred twenty days later. First, Brushy Creek and WFI mutually terminated the leases over the mine. Next, Brushy Creek sold its equipment and surface rights to WFI for $1. These transactions were executed on behalf of Brushy Creek by Ed Throop and on behalf of WFI by Bernard Cevera. Next, the WFI (by Cevera) leased all of the Brushy Creek Mining rights and the equipment acquired from the Brushy Creek Mine to Liberty (by Throop as Liberty president). Finally, the WFA and Liberty executed an Administrative Services Agreement in

9

which Liberty agreed to pay the WFA 25¢ per ton of coal mined and WFA would provide Liberty administrative services. Liberty never paid this fee, nor was the agreement terminated.

The labor at the newly-reopened Brushy Creek Mine was not provided by Liberty but instead by NuBay Mining LLC, which was formed as a Colorado Limited Liability Company on September 6, 2001. Its registered agent was at the same address as Liberty and WFI's registered agent, and it was owned by the person who oversaw the labor pool at Brushy Creek Mine. Liberty made NuBay an independent contractor on April 26, 2002, and NuBay provided employees to construct and operate the Brushy Creek Mine. Liberty would reimburse NuBay for 100% of its costs and expenses. They also agreed that in the event of termination of the agreement, Liberty had the right to purchase all the ownership interest of NuBay from the owner for $1.

Liberty went to Fifth Third Bank to get financing for mine equipment and materials. It agreed with Fifth Third on April 30, 2002 to borrow $9.1 million. The indebtedness was guaranteed by WFI and the Cities Trust. Cities Trust signed the Loan Agreement acknowledging its guarantee of the Liberty debts to Fifth Third Bank, and on February 28, 2002, Cities Trust executed a guarantee of Liberty debt. Cities Trust also guaranteed Liberty's equipment leases. These loans were collateralized by the mine real estate and the equipment owned by WFI that included the previous real property leased by Brushy Creek and the equipment owned by Brushy Creek. Edward Throop, who is one of the designated Board Member of Liberty and President of Liberty, the Vice President of Western Fuels Illinois and the general manager of Sikeston, testified under oath at his Rule 2004 Examination on May 10, 2007, that Liberty would not have been able to borrow monies without the WFI guaranties.

The Defendants also provided other financing to Liberty. The Sikeston Board loaned Liberty $1.84 million and WFI loaned Liberty $1.66 million. According to the Defendants, none of these

more than $3.5 million of loans were ever repaid. Approximately $2.75 million dollars of these "loans" were made in 2006 only after Liberty was preparing to close the mine.[2]

Loans were not the only sources of financing for Liberty. Eventually, the government grants for which the Brushy Creek employees applied were approved. Liberty made other applications for government grants during its lifetime such that it received approximately $5 million in grants that did not need to be paid back.

Liberty made coal sales agreements with Tarex Construction, Inc. on January 25, 2002 and the Tennessee Valley Authority (TVA) on March 27, 2002. Under the TVA contract, Liberty agreed to supply 500,000 tons of coal annually for a period of five years. Under the Tarex contract, Liberty agreed to supply 140,000 tons of coal per year for a period of three years. This supply period was subsequently extended to a little more than five years. Liberty also made additional sales of coal in smaller amounts to other parties.

Liberty started operations in June 2002. During its operation of the Brushy Creek Mine, Liberty installed improvements to the mine real estate for "mine development" in the amount of $7,541,779.94 and "building improvements" in the amount of $887,360.24. All of these items reverted to WFI upon termination of the Mine Lease Agreements.

The mine did not prove profitable. While the mine did show a profit of a little over $600,000 in 2003, it had losses of over $1 million in 2002 and 2004 and losses of a little over $700,000 in 2005. Liberty did not make any payments to WFI on the Mine Lease. On January 1, 2003, the mining operation was still under way, but on that date WFI, Liberty and Brushy Creek executed a settlement agreement and release with Midwest Coal Development Company, Buddie Morris and Thomas

---

[2] Frazier claims in her brief that "[t]hese funds were advanced to preserve the assets of the Defendants" and cites the record on appeal. The exhibit that she cites, though, contains no indication that the loans were made for the purpose she claims.

Morris (collectively "Midwest") which obligated "Liberty/WFI" to pay Midwest $916,600.00 to settle claims of Midwest under a prior commission contract. In exchange Midwest released WFI, Brushy Creek, WFA, and the Utilities from any and all claims based on these contracts that predated the existence of Liberty. This agreement was signed by Robert Norrgard for WFI, Liberty and Brushy Creek. Liberty also had to request several modifications and waivers of its loan provisions with Fifth Third Bank because it could not meet the financial benchmarks required in the loan agreements. Liberty also defaulted on its obligation to pay property taxes for 2005 and 2006, and WFI picked up the tab.

On July 13, 2006, Liberty indefinitely suspended mining operations at the Brushy Creek Mine. On November 14, 2006, WFI served upon Liberty a notice, signed by Duane Richard as Secretary of WFI, asserting default under the lease of the Brushy Creek Mine. The notice stated that the reason for the termination was that Liberty had failed to make the rent payments to WFI. This was the first declaration of default even though WFI never received a lease payment over the 4-year term of the lease. Liberty declared bankruptcy a week later.

None of the defendants received value from the Liberty venture. The Utilities and WFI, in fact, suffered losses from the venture: WFI was never paid for its lease, the Sikeston Board was not repaid the $1.84 million loan; WFI was not repaid the $1.66 million loan; the Utilities never received coal from Liberty, nor did Liberty sell any coal to the Utilities; no defendants received a dividend, employment income, or fees.Liberty and the other defendants have common directors or officers. Liberty had Bernie Cevera, Edward Throop, Robert Norrgard, Darrell Dorsey and Duane Richards. WFI had the same complement of officers. The Sikeston Board employed Edward Throop. The Kansas Board employed Bernie Cevera and Darrell Dorsey. Western Fuels Association employed Robert Norrgard.

**Analysis**

Frazier argues that the bankruptcy court erred in granting summary judgment to the defendants. She claims sufficient evidence was presented to raise material facts on all issues of veil piercing. The Court disagrees. She did not demonstrate that the defendants used the corporate form to perpetrate a fraud or defeat creditor claims, so the Court will affirm the summary judgment entered by the bankruptcy court.

Choice of Laws

The parties agree that, given Illinois choice-of-law rules and Liberty's state of organization, Colorado veil piercing law applies in this case. The Court also agrees. *See Stromberg Metal Works v. Press Mech.*, 77 F.3d 928, 933 (7th Cir. 1996) (noting that federal courts sitting in Illinois apply Illinois choice-of-law rules when deciding state-based claims and that attempts "to 'pierce the corporate veil' are governed by the law of the state of incorporation"). A court should pierce the corporate veil if (1) the corporate entity is the alter ego of the shareholder, (2) the corporate form was used to perpetrate a fraud or defeat a rightful claim and (3) the balance of the equities favors disregarding limited liability. *In re Phillips*, 139 P.3d 639, 643–44 (Colo. 2006). The policy idea behind veil piercing is simple and follows the inquiries in the case: when the corporation is really the same as the shareholder, the shareholder should not be allowed to escape the perpetration of a fraud simply because the shareholder used the corporation to do it. However, "[c]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *Boughton v. Cotter Corp.*, 65 F.3d 823, 836 (10th Cir. 1995) (applying Colorado law) (quoting *Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1576 (10th Cir. 1990)). The party seeking to pierce the veil bears the burden of proof, *In re Phillips*, 139 P.3d at 643–44.

Perpetration of a Fraud or Defeat of Rightful Claim

Frazier argues that the involvement of the Utilities with Liberty defeated their rightful claims or perpetrated a fraud that harmed the creditors.

First, she correctly argues that Missouri counties, cities and other political corporations or instrumentalities cannot "own or subscribe for stock in any corporation or association." Mo. Const. art. VI, § 23. She argues, then, that as an owner of Liberty, the Sikeston Board violated the Missouri Constitution. It is undisputed that the Sikeston Board is an instrumentality of the state and subject to this provision. It is also undisputed that even though WFSC held legal title to 100% of the membership interest in Liberty as trustee of the Cities Trust, the Sikeston Board, as a beneficial owner of the trust corpus, held an equitable interest in Liberty. Frazier does not explain, though, how Sikeston Board's equitable interest perpetrated a fraud or injustice that harmed the creditors. Perhaps that is because the Sikeston Board's beneficial interest in Liberty did not harm any creditor or prejudice anyone. Accordingly, the fact that the Sikeston Board had a beneficial interest in Liberty does not support her case on fraud/rightful claim.

Second, Frazier correctly argues that Missouri counties, cities and other political corporations or instrumentalities cannot "lend its credit or grant public money or thing of value to or in aid of any corporation, association or individual." Mo. Const. art. VI, § 23; *see also id.* art. VI, § 25 (noting that "[n]o county, city or other political corporation or subdivision of the state shall be authorized to lend its credit or grant public money or property to any private individual, association or corporation" except in a few specified cases).[3] It is undisputed that Sikeston loaned money to Liberty and that Sikeston is subject to this section. Additionally, it is undisputed that the Cities Trust

---

[3] Frazier also argues that Kansas instrumentalities cannot guarantee a loan to a private corporation but offers absolutely no law in support of this proposition, either in her main brief or on reply after the appellants pointed it out. The Court considers this argument abandoned.

guaranteed certain loans to Liberty. The applicability of the section to the Cities Trust is an interesting question, but one that the Court need not reach because the loan and guarantee were for a public use. Besides the explicit exceptions to lending credit in § 25, Missouri law has developed a "public use" exception, with the understanding that no grant or guarantee is made to a *private* individual or corporation if the grant was for a legitimate public purpose. *See State ex. rel. Mitchell v. City of Sikeston*, 555 S.W.2d 281, 291 (Mo. 1977) (en banc) ("The second theory under which the constitutionality of this funding arrangement [in which Sikeston's revenue bonds for the acquisition of a power plant would be paid back by proceeds from energy sales] may be sustained is that no violation of sec. 23 or 25, art. VI, Missouri Constitution, occurs where the expenditure of public funds is for a public purpose."). The instrumentalities of the state were liable for legacy costs associated with former mining operations; making grants and guarantees such that Liberty, the going concern that would pay off the legacy costs, had a chance to survive was a public purpose, especially because public entities, and not private corporations or individuals, were intended to benefit from these transactions.[4] Additionally, as with her stock ownership argument, Frazier has not demonstrated how the Sikeston Board's loan or the Cities Trust's guarantee of loans made to Liberty prejudiced the creditors.

Frazier's third argument is that, on the basis of the undisputed evidence, Liberty was undercapitalized. She advances this argument not only in support of her alter ego theory (of which undercapitalization is a factor) but also in support of her fraud/illegality/wrongdoing contention.

---

[4] Frazier argues in her reply that "[t]he sole purpose of lending these monies to Liberty Coal was for the purposes of securing and maintaining the mine in order to allow all the underground equipment to be removed from the mine, not to pay any of the unsecured creditors of Liberty Coal, except for its workers compensation carrier." (Doc. 17 at 11.) In support of this assertion, she cites "Record on Appeal 23, pg. 2, ¶ 9" which, according to her docketing statement, is a series of seventeen exhibits in opposition to summary judgment. (See Doc. 2 filed in this case (numbering Doc. 74 in 08-4045 as Doc. 23 for purposes of appeal.) Page 2 of that collection is the bill of sale of the Brushy Creek equipment to WFI in July 2001, which does not support her assertion. The Court has diligently examined the rest of the exhibits, numbering 114 pages, and simply cannot find what she is talking about.

Granted, undercapitalization would be inherently prejudicial because, by definition, undercapitalization occurs when a corporation or limited liability company is unreasonably funded at startup such that it would be unable to pay its liabilities and obligations when they become due. 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 41.33 (West 2009). The inquiry on undercapitalization looks at the capital at the time of formation of the corporation. *Id.* Colorado law does not offer guidance as to what sort of conduct constitutes undercapitalization, but it is undisputed that, although grants and loans were contributed to Liberty later in the operation, there was no capital contribution at the time that the Cities Trust acquired the ownership interest in Liberty. Still, the fact that Liberty was undercapitalized does not help Frazier in proving fraud or wrongdoing. Frazier's attempt to advance mere undercapitalization as fraud or the defeat of a rightful claim is misplaced because, by itself, undercapitalization does not belong to any of those categories. Mere underestimation of required startup capital does not rise to the level of fraud or wrongdoing. As the text of *Phillips* indicates, a plaintiff would need to provide evidence of more than mere negligence in starting the corporation. The plaintiff would have to show fraud or wrongdoing associated with the undercapitalization. For example, she could have shown that the defendants undercapitalized to defeat the rightful claim of a creditor or that they undercapitalized and held themselves out as adequately capitalized. Frazier only argues that the venture was not properly funded at startup, not that the defendants funded the venture in a fraudulent manner or in a way to defeat creditor's rights. This undercapitalization is not a fraud and was not used to defeat the rightful claims of creditors.

Frazier's fourth argument is related to the undercapitalization argument: that the Sikeston Board and WFI transferred funds to Liberty in the form of loans (not equity) solely to preserve the assets of Liberty and that this was fraudulent or the product of wrongdoing. This argument suffers on two fronts. First, Frazier does not demonstrate how these loans prejudiced the creditors. By

contributing more money to Liberty, the defendants prolonged the life of Liberty and, if anything, increased the possibility of Liberty's success, though it ultimately failed. Second, as the Colorado Court of Appeals has noted:

> It would frustrate the purposes of corporate law to expose directors, officers, and shareholders to personal liability for the obligations of a corporation when they, in their individual capacities, contribute funds to, or on behalf of, a corporation for the purpose of assisting the corporation to meet its financial obligations, and not for the purposes of perpetrating a fraud or promoting their personal affairs.

*Hill v. Dearman*, 900 P.2d 127, 128 (Colo. App. 1980). Frazier offers no evidence that the loans were provided to perpetrate a fraud or to promote WFI's and the Sikeston Board's personal affairs.

Frazier's last ditch attempt to prove fraud, illegality, or wrongdoing is to argue that Liberty defeated the rightful claims of its creditors. The sum total of her argument and evidence on this part is that the creditors of Liberty cannot satisfy their claims. Standing alone, this does not justify piercing the corporate veil. The argument contradicts a legitimate purpose of the law of limited liability: to give its members a shield from individual liability when the LLC cannot satisfy its obligations to creditors. Merely arguing that the creditors cannot get their money from an LLC due to its limited liability nature is not enough to demonstrate a defeat of the rightful claims of creditors. *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 778 F. Supp. 1116, 1123 (D. Colo. 1991) ("In any case where a corporate creditor will go unsatisfied if he cannot reach a shareholder, it could be said that recognition of the corporate form would be unjust However, the law treats corporations as separate persons precisely to shield a shareholder from individual liability.").

Alter Ego and Other "Issues of Fact"

Frazier argues that Judge Meyers erred in holding that Liberty was not an alter ego of the Utilities. She also argues that she demonstrated several issues of fact at summary judgment, concluding the motion should not have been granted.

The Court does not need to reach these issues because Frazier cannot prove fraud or illegality or wrongdoing which are necessary components of her claim, independent of her alter ego theory. Successfully proving an alter ego theory merely gives her a deep pocket from which to collect, but she cannot draw from it absent proving liability, which she cannot do. Even if Liberty was an alter ego of the stakeholders or even if there are other "issues of fact" still present in the case, Liberty was not used to perpetuate a fraud or to defeat the rightful claims of creditors, which was an essential component of a veil piercing case. *See In re Phillips*, 136 P.3d at 643–44. Accordingly, any other dispute of fact is immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *accord Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1027, 1036 (7th Cir. 2004) (quoting *Celotex*, 477 U.S. at 323).

The Court next addresses an argument that Frazier presents claiming that the Court must address the *Phillips* elements *in order* such that alter ego must be addressed first, fraud second, and the equities third. The trustee "in her extensive research of Colorado veil piercing law and veil piercing law of other states" could not find one case where a court could perform veil piercing analysis in reverse. She makes this argument because, she argues, the fraud aspects of the case come out more once the alter ego element has been fully addressed. Although it is true that the cases she cited address the veil piercing elements in order, no court holds that they *must* be taken in order. But even if they are taken in the proposed order, the result is the same. For example, assume that Frazier is successful on the first inquiry and that Liberty is the alter ego of the Utilities. So, on to inquiry number two: was Liberty used to perpetuate a fraud or defeat a rightful claim? No.

Besides, there is Colorado case law suggesting that the Court need not take the inquiry in order. For example, the Colorado Supreme Court, assuming without deciding that alter ego existed, found no cause for piercing the corporate veil due to the lack of fraud or defeat of a rightful claim. *Contractors Heating & Supply Co. v. Scherb*, 432 P.2d 237, 238–39(Colo. 1967) ("The corporate form,

however, will not be disregarded unless a clear showing is made that it was used to perpetrate a fraud or defeat a rightful claim." (citing 1 William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 41 (rev. ed. 1963))). Because the Court has taken the same approach as the Colorado Supreme Court, it is satisfied that no further inquiry is necessary.

### Conclusion

Frazier was unable to present an issue of fact that the appellants committed fraud, illegality, or unjustly defeated the claims of debtors through the use of Liberty Coal Co., an essential component of her attempt to pierce its veil of limited liability. Summary judgment was appropriate, so the judgment of the bankruptcy court is **AFFIRMED**.

**IT IS SO ORDERED.**

**DATED March 31, 2010.**

                                                        s/ Michael J. Reagan
                                                        **MICHAEL J. REAGAN**
                                                        **United States District Judge**